UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PRINCIPAL LIFE INSURANCE CO., | ) |
| | ) No. 23 CV 04203 |
| Plaintiff, | ) |
| | ) |
| v. | ) Magistrate Judge Young B. Kim |
| | ) |
| MICAH T. SAUGEN and JAMES E. CONDRA, Individually and As Personal Representative of the Estate of Michael W. Condra, | ) ) ) ) |
| | ) April 28, 2025 |
| Claimants. | ) |

**MEMORANDUM OPINION and ORDER**

Principal Life Insurance Company ("Principal") filed this interpleader action against claimants Micah T. Saugen and James E. Condra ("James")[1] to determine the beneficiary of Decedent Michael W. Condra's ("Michael") life insurance policy (the "Policy"). Before the court is Saugen's motion for summary judgment seeking the insurance proceeds. Although the Policy identifies Saugen as the primary beneficiary, Michael's father, James, opposes the motion on the basis that Saugen poisoned Michael and is barred from receiving the benefits under the Illinois Probate Act of 1975, 755 Ill. Comp. Stat. 5/2-6, (the "Slayer Statute"). For the following reasons, Saugen's motion is denied:

---

[1] To avoid confusion, the court refers to Michael and James Condra by their first names throughout this opinion.

**Facts**[2]

Saugen and Michael met in 2021 and eventually moved in together in May 2022. (R. 48, James's Resp. to Saugen's Statement of Facts and Statement of Undisputed Facts ("JSOF") ¶ 40; R. 53, Saugen's Resp. to JSOF ("SRJSOF") ¶ 40). Meanwhile, Michael enrolled in the Policy through his employer in March 2022, and designated his father as the primary beneficiary. (R. 44, Saugen's Am. Statement of Undisputed Facts ("SASOF") ¶ 9; R. 48, JSOF ¶ 9.) But on June 28, 2022, Michael submitted a change of beneficiary form, naming Saugen as the primary beneficiary of the Policy. (R. 44, SASOF ¶ 10; R. 48, JSOF ¶ 10.)

During their relationship, Saugen and Michael recreationally used drugs, including ketamine and gamma-hydroxybutyrate ("GHB"). (R. 44, SASOF ¶ 21; R. 48, JSOF ¶ 21.) Ketamine is an anesthetic that Saugen says causes the user to feel "airy, a little dissociative," and carefree. (R. 42-1, Saugen's Statement of Material Facts ("SSOF"), Ex. A, Dr. Adam Negrusz Ltr. at 2; id. Ex. D, Saugen Dep. at 23.) According to the U.S. Drug Enforcement Administration, ketamine use can produce "a state of sedation (feeling calm and relaxed), immobility, relief from pain, and amnesia (no memory of events while under the influence of the drug)," and is "abused for its ability to produce dissociative sensations and hallucinations." *Drug Fact Sheet: Ketamine*, Drug Enforcement Administration, https://www.dea.gov/sites/default/files/2020-06/Ketamine-2020.pdf (last visited April

---

[2] Only those facts that are properly presented, supported, and relevant to the motion are considered. Because James filed certain information under seal, the court made efforts to avoid disclosing confidential information unless disclosure was necessary to explain its ruling herein.

25, 2025). Saugen and Michael used ketamine approximately three to four times per week from May through October 2022. (R. 48, JSOF ¶ 64; R. 53, SRJSOF ¶ 64.)

GHB is a "potent central nervous system depressant" that is "widely available, inexpensive, and therefore frequently abused." (R. 42-1, SSOF Ex. A, Dr. Negrusz Ltr. at 2.) It causes a user to feel "inebriated" as if "on alcohol without the nausea" and "relaxed," and excessive use can cause loss of consciousness and vomiting. (Id. Ex. E, Luke Meierdiercks Dep. at 44-45.) GHB is typically in liquid form and consumed like a shot or mixed into other drinks. (Id. at 47, Ex. A, Dr. Negrusz Ltr. at 2; R. 48 JSOF, Ex. F, Nick Negron Dep. at 35.) According to James's expert, Dr. Negrusz, a recreational dose of GHB can be difficult to determine but is believed to be between one to five grams. (See R. 42-1, SSOF, Ex. A, Dr. Negrusz Ltr. at 2.) Luke Meierdiercks, a friend of Saugen's and Michael's, estimated that a typical dose of GHB is approximately two milliliters, about two grams. (R. 42-1, SSOF, Ex. E, Meierdiercks Dep. at 45.) But the concentration of GHB in beverages can vary and the user is usually unaware of the exact dose. (Id. Ex. A, Dr. Negrusz Ltr. at 2.)

Different GHB concentrations in blood produce different effects on the user. Typically, concentrations under 52 mcg/mL produce wakefulness, those from 52 to 150 mcg/mL produce light sleep and euphoria, those between 150 to 260 mcg/mL produce moderate sleep, and concentrations higher than 260 mcg/mL produce deep sleep and can induce coma. (R. 48, JSOF, Ex. M, Cook Cnty. Med. Rep. at 12; R. 42-1, SSOF, Ex. A, Dr. Negrusz Ltr. at 2.) As such, doses resulting in blood

concentration up to 200 mcg/mL are considered therapeutic, while those resulting in concentrations between 200 mcg/mL up to 340 mcg/mL are considered toxic. (Id.) In fact, blood concentrations ranging from 220-4400 mcg/mL have been observed in lethal GHB poisonings. (R. 42-1, SSOF, Ex. A, Dr. Negrusz Ltr. at 2.)

Because of the potentially significant effects, GHB users are "very scientific" about the dose they consume and how frequently they consume such doses. (Id. Ex. E, Meierdiercks Dep. at 45.) But while Saugen, Michael, and their friends used a dropper to carefully measure the dose of GHB, (R. 48, JSOF ¶ 45; R. 53, SRJSOF ¶ 45), an individual's "response to low oral doses is unpredictable and variable within the same individual," (R. 48, JSOF, Ex. M, Cook Cnty. Med. Rep. at 12). Saugen estimated Michael had used GHB between 15-30 times total. (R. 48, JSOF ¶ 19; R. 42-1, SSOF, Ex. D, Saugen Dep. at 17-19.) Combining GHB with ketamine can present additional uncertainty and danger. Indeed, Dr. Negrusz says that mortality rates associated with GHB are high, "especially when [GHB is] taken with dissociate anesthetic ketamine, and other central nervous system depressants." (R. 42-1, SSOF, Ex. A, Dr. Negrusz Ltr. at 2.)

Saugen's and Michael's drug use led to several issues during their relationship. For example, Michael overdosed on GHB twice in the summer of 2022. (See R. 44, SASOF ¶ 22; R. 48, JSOF ¶ 22.) The first overdose caused Michael to become "paranoid." (Id.) The second resulted in a loss of consciousness. (Id.) Additionally, Saugen's drug use was described as a "stressor" in their relationship. (R. 48, JSOF ¶ 42; R. 53, SRJSOF ¶ 42.) For example, on October 7, 2022, after

4

Michael refused to give Saugen money to buy drugs, Saugen locked himself in their bathroom, refused to talk to Michael, and broke up with him by text message. (R.53, SRJSOF ¶ 43; R. 42-1, SSOF, Ex. D, Saugen Dep. at 52-53.) At some point between then and October 20, 2022, they ended their relationship.

Saugen and Michael continued to share their apartment after their breakup, however, (R. 53, SRJSOF ¶ 44; R. 42-1, SSOF, Ex. D, Saugen Dep. at 55-57), and on the evening of October 26, 2022, Saugen prepared ramen noodles for himself and Michael at their apartment, (R. 48, JSOF ¶ 62; R. 53, SRJSOF ¶ 62). A short time later, Saugen and Michael took ketamine together and then watched a movie. (R. 53, SRJSOF ¶¶ 62, 63.) They went to bed in separate bedrooms at about 11:30 p.m. (Id. ¶ 63; R. 42-1, SSOF, Ex. D, Saugen Dep. at 58.)

The following morning, at about 8:15 a.m., Saugen noticed that Michael was not in the home office despite having a meeting scheduled for 8:00 a.m. (R. 53, SRJSOF ¶¶ 54, 66.) Saugen entered Michael's bedroom and found Michael unresponsive. (Id. ¶¶ 54-55.) He called 911 and administered CPR until paramedics arrived. (Id.) Despite the effort, Michael was pronounced dead at about 9:00 a.m. (R. 48, JSOF, Ex. M, Cook Cnty. Med. Rep. at 4, 15.)

While the police were still present in the apartment, Saugen called Meierdiercks, who arrived shortly thereafter. (R. 42-1, SSOF, Ex. E, Meierdiercks Dep. at 49-51.) Meierdiercks testified that after he arrived, Saugen told him that he found Michael "dead in bed" with "a bunch of . . . empty G bottles around him and throughout the room," and that a GHB overdose caused Michael's death. (Id.)

5

However, the medical examiner's report indicates that the police officer responding to the call did not find any "drugs or paraphernalia . . . on scene." (R. 48, JSOF, Ex. M, Cook Cnty. Med. Rep. at 4.)

On or about October 28, 2022, Saugen found three empty glass bottles in a laundry hamper in the apartment he had shared with Michael. (R. 53, SRJSOF ¶¶ 58-60.) Saugen recognized the bottles as the type that would typically contain GHB, and Saugen had seen those three specific bottles contain GHB when Michael lost consciousness that summer. (Id.) But Saugen did not report this finding to the police, (id.), even though James implored Saugen to share this information with investigators, (R. 42-1, SSOF, Ex. C, James Dep. at 42-44).

The Cook County medical examiner's office performed an autopsy on Michael and the toxicology analysis revealed the presence of cocaine in his system, along with 370 ng/ML of norketamine, 180 ng/mL of ketamine, and 980 mcg/mL of GHB. (R. 48, JSOF, Ex. M, Cook Cnty. Med. Rep. at 19; R. 42-1, SSOF, Ex. A, Dr. Negrusz Ltr. at 2.) The medical examiner concluded that Michael died of "combined drug (gamma-hydroxybutyric acid and ketamine) toxicity." (R. 48, JSOF, Ex. M, Cook Cnty. Med. Rep. at 20.) However, the report noted that the manner of death was "undetermined" because it was unknown "whether [Michael] knowingly and willfully ingested the drug(s) himself or if the drug(s) were given to him by someone else without his knowledge." (Id.) At some point James told the Chicago Police Department ("CPD") that he suspected Saugen had killed Michael. (R. 42-1, SSOF, Ex. C, James Dep. at 60-61.) Thereafter CPD investigated Saugen but never

6

charged him with any crime and there is no indication that the investigation is ongoing.

Throughout these events and until his death, Michael regularly attended therapy sessions. Michael discussed with his therapist struggles with his family and Saugen, addiction, drug use, and finances, including feeling "taken advantage of due to financial stability." (See, e.g., R. 49, Ex. K (sealed), Therapy Records at 3, 35, 79, 103, 105, 107.) Michael's therapy notes do not include specific names of individuals taking advantage of him or evidence of suicidal ideations. (See, e.g., id. at 111.) Michael also attended a substance abuse program in or about September 2022. (R. 42-1, SSOF, Ex. D, Saugen Dep. at 28-29.)

## Procedural Background

In June 2023 Principal filed a complaint for interpleader relief, seeking a declaration as to who is entitled to death benefits under the Policy. (See R. 1, Compl.) Principal then filed a motion to discharge and dismiss on September 14, 2023. (R. 18, Principal's Mot. Discharge and Dismiss.) The court granted the motion after Principal filed a certificate of compliance showing that it deposited with the court $110,000 in life insurance proceeds due under the Policy and produced to Saugen and James a copy of its file pertaining to the Policy. (R. 22, Cert. Compliance; R. 24, Registry Deposit Information Form.)

Thereafter, James disputed the propriety of the change in beneficiary form and argued in the alternative that Saugen was barred from receiving benefits under the Slayer Statute. (R. 13, James's Initial Status Rep. ¶ 1.E.) After the close of fact

discovery, James abandoned the first argument but maintains his Slayer Statute argument. (R. 35, James's Status Report.) For support, James offered a report dated May 3, 2024, in which toxicology expert Dr. Negrusz noted an unusually high concentration of GHB in Michael's blood. (R. 42-1, SSOF, Ex. A, Dr. Negrusz Ltr. at 2.) However, Dr. Negrusz does not opine about the cause of such concentration.

## Legal Standard

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there exists "no genuine dispute of material fact" such that "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Biggs v. Chi. Bd. of Educ.*, 82 F.4th 554, 559 (7th Cir. 2023). A material fact is a fact relevant to the outcome of the pending action. *See Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014). "A 'genuine issue' exists with respect to any such material fact . . . when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 681-82 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

At the summary judgment phase, all facts must be construed and reasonable inferences must be drawn in a light most favorable to the non-movant. *Biggs,* 82 F.4th at 559. Construing facts and inferences "'[i]n the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Smith on Behalf of Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Indeed, making choices between reasonable inferences from evidence is necessarily "a jury

function." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Whether an inference is reasonable or speculative is a fact-specific inquiry, but "[a]n inference is not reasonable if it is directly contradicted by direct evidence provided at the summary judgment stage, nor is a 'conceivable' inference necessarily reasonable at summary judgment." *Levin v. Altisource Sols., Inc.*, No. 22 CV 389, 2024 WL 4651858, at *5 (N.D. Ill. Nov. 1, 2024) (quoting *Perez v. Staples Cont. & Com. LLC*, 31 F.4th 560, 571 (7th Cir. 2022)). Here, granting summary judgment would require the court to choose between competing inferences, so it is not proper.

**Analysis**

The only remaining factual issue is whether the Slayer Statute bars Saugen from receiving the insurance proceeds because he "intentionally and unjustifiably" caused Michael's death. (R. 46, James's Resp.) James argues that circumstantial evidence—when viewed in his favor—demonstrates that Michael did not accidentally overdose on GHB or commit suicide and that a jury could conclude that Saugen poisoned Michael. (Id. at 3.) If so, Illinois's Slayer Statute would bar Saugen from recovering the insurance proceeds. 755 Ill. Comp. Stat. 5/2-6 ("A person who intentionally and unjustifiably causes the death of another shall not receive any property, benefit, or other interest by reason of the death, whether as heir, legatee, [or] beneficiary[.]"). For his part, Saugen maintains that James's poisoning argument is without merit, and any claim that the Slayer Statute applies is merely speculative. Accordingly, the court must assess whether there is enough evidence to trigger the Slayer Statute.

9

A. **Slayer Statute**

While it is Saugen's burden as the movant to demonstrate a lack of any genuine issue of material fact, he need not "prove his innocence" to overcome the Slayer Statute argument. *Banner Life Ins. Co. v. Shelton*, No. 17 CV 7097, 2019 WL 3801641, at *3 (N.D. Ill. Aug. 13, 2019) (citing *In re Buehnemann's Estate*, 324 N.E.2d 97, 99 (Ill. App. Ct. 1975) ("Appellant asks us to apply the 'clean hands' doctrine, to hold that one under suspicion of foul play should be forced to litigate his innocence or guilt in the probate court. This we cannot do.")). Instead, James has the burden to show that a factfinder could draw reasonable inferences supporting the application of the Slayer Statute and may do so via circumstantial evidence. *See Jones v. Van Lanen*, 27 F.4th 1280, 1286 (7th Cir. 2022) ("[W]e recognize full well that circumstantial evidence may be enough to survive summary judgment if that evidence could allow a jury to draw a reasonable inference in support of the non-moving party."); *see also Eskridge v. Farmers New World Life Ins. Co.*, 621 N.E.2d 164, 169-70 (Ill. App. Ct. 1993) (analyzing circumstantial evidence at summary judgment stage to determine applicability of Slayer Statute).

Furthermore, when alleging criminal conduct in a civil proceeding as in this case, the criminal conduct "need only be proved by a preponderance of the evidence rather than beyond a reasonable doubt." *Banner*, 2019 WL 3801641, at *2 (citing *Matter of Estate of Hook*, 566 N.E.2d 759, 767 (Ill. App. Ct. 1991)); *see also Metro. Life Ins. Co. v. Kelley*, 890 F. Supp. 746, 749 (N.D. Ill. 1995). Nevertheless, "the evidence of guilt must be clear and convincing." *Hook*, 566 N.E.2d at 767 (internal

10

citations omitted). In other words, James must point to evidence permitting a straightforward inference of causation, even if that inference is based on circumstantial evidence. *Compare Eskridge*, 621 N.E.2d at 170 (affirming summary judgment finding that Slayer Statue applied based on circumstantial evidence showing "reasonable indications of foul play"), *with Hook*, 566 N.E.2d at 759, 765-66 (denying applicability of Slayer Statute based on lack of credible circumstantial evidence presented at bench trial), *and Estate of Dillard ex rel. Dillard v. Green*, 2011 IL App (1st) 102596-U, ¶ 35 (affirming directed verdict denying applicability of Slayer Statute based on lack of credible circumstantial evidence presented at trial). As such, to survive summary judgment, James must "put forward evidence that would allow a trier of fact to nudge the ball over the 50-yard line" and infer it was "more likely than not" that Saugen intentionally caused Michael's death. *Falcon v. City of Chi.*, No. 17 CV 5991, 2021 WL 1222869, at *3 (N.D. Ill. March 31, 2021) (quoting *Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 934 (7th Cir. 2018)).

Criminal investigations or charges can also impact a court's Slayer Statute analysis. For example, summary judgment may be denied as premature where a criminal investigation is ongoing. *See Banner*, 2019 WL 3801641, at *1-2 (denying summary judgment for beneficiary where "investigation [into the decedent's death was] still open and ongoing"). Here, CPD never charged Saugen with a crime and there is no indication of any ongoing criminal investigation into Michael's death. That said, because the burden of proof in criminal cases is higher than in civil cases, a closed investigation from which charges were never brought does not end the

11

court's analysis. *See Hook*, 566 N.E.2d at 768 (finding that despite an acquittal in a murder trial, "objectors must still prove by a preponderance of the evidence that respondent intentionally and unjustifiably caused her husband's death[.]").

**B.     Circumstantial Evidence**

James argues that summary judgment is not proper because circumstantial evidence permits a factfinder to reasonably infer that Saugen poisoned Michael. (See R. 46, James's Resp. at 5-6.)  For support, he points to: (1) Saugen's awareness that he would receive benefits under the Policy in the event of Michael's death; (2) Saugen's and Michael's breakup only weeks before Michael's death; (3) the stress Saugen's drug use placed on their relationship; (4) Saugen preparing dinner for Michael the night before his death; and (5) the inconsistency between Saugen's statement about finding drugs near Michael's body and the responding officer's report indicating lack of any drugs or paraphernalia at the scene. (Id.)  Each piece of evidence standing alone may not be sufficient, but when combined, a reasonable jury could conclude that Saugen caused Michael's death for the insurance money.

Saugen argues that James's asserted inference that Saugen poisoned Michael is merely speculative and not reasonable. (R. 52, Saugen's Reply at 2-3.)  Whether an inference is reasonable or speculative depends on the inferential leaps the court is required to perform.  In *Flowers v. Kia Motors Finance*, 105 F.4th 939 (7th Cir. 2024), the Seventh Circuit considered the plaintiff's evidence in a case involving a defendant auto finance company's alleged unlawful practice to repossess her car. One morning, the plaintiff found a truck parked behind her car.  *Id.* at 941-42.  The

12

truck first prevented the plaintiff from leaving her parking space and then eventually tailed her onto the highway before she evaded the truck. *Id.* She alleged that this tactic amounted to an unlawful debt collection practice. *Id.* In affirming summary judgment for the defendant finance company, the Seventh Circuit found that the plaintiff failed to offer any evidence concerning who owned or operated the truck, why the truck was near her car, or whether the defendant was involved in the incident in any way. *Id.* at 946. The court deemed speculative the inferences the plaintiff asked the court to draw because they required "inferential leaps" to answer "[w]hy else would [the truck] be there" except at defendant's direction. *Id.* at 947. But unlike in *Flowers*, the court here is not persuaded that the inferences James asks the court to draw are speculative or require it to perform "inferential leaps," *id.*, given Saugen's knowledge of his beneficiary status under the Policy and other unusual circumstances surrounding Michael's death.

Saugen next argues that even reasonable inferences drawn in James's favor should be limited at the summary judgment stage because James relies solely on circumstantial evidence to support his Slayer Statute claim—and does not rule out other "plausible causes of death." (R. 52, Saugen's Reply at 3-5.) Saugen contends that "an inference equally likely to another inconsistent inference is speculation or conjecture and will not avoid summary judgment." (Id. at 3-4 (citing *Harper v. U.S. Beef Corp.*, No. 15 CV 3112, 2018 WL 3863526 (C.D. Ill. July 23, 2018)).) But the court is not permitted to make "a choice of [equally likely] inferences" when ruling on a motion for summary judgment. *See Smith*, 129 F.3d at 426. And the opinion

13

Saugen cites, *Harper*, 2018 WL 3863526 at *5, relies on *Pyne v. Witmer*, 543 N.E.2d 1304 (Ill. 1989), and *Vuletich v. Alivotvodic*, 392 N.E.2d 663 (Ill. App. Ct. 1979)—neither of which involve the Slayer Statute. Instead, *Pyne* and *Vuletich* discuss more generally what inferences may be drawn from circumstantial evidence. The court in *Pyne* held that at the summary judgment stage, "circumstantial evidence 'need not both create a reasonable inference of the fact to be shown and also exclude all other possible inferences,'" in contradiction to Saugen's assertion otherwise. 543 N.E.2d at 1313 (quoting *Campbell v. Northern Signal Co.* 430 N.E.2d 670 (Ill. App. Ct. 1981)). *Vuletich* in turn relates to strict liability under Illinois law, which is not applicable here. 392 N.E.2d 667-68. As such, neither decision advances Saugen's position.

In any event, factual distinctions between this case and *Harper* render the latter inapplicable. Each inference the plaintiff asked the court to draw in *Harper* was based solely on narrative evidence from the plaintiff's own testimony, or expert analysis derived from the plaintiff's testimony. *See Harper*, 2018 WL 3863526, at *7 ("[A]ll the medical professionals' opinions tying the ingestion event *to Defendant's Pepsi* are based on Mrs. Harper telling them as much."). As such, the court held that while there was "evidence from which a reasonable inference [could] be drawn" that the plaintiff "was injured from ingesting *something* harmful," her own speculation was "not enough to create an issue of fact." *Id.* In short, *Harper* is unavailing to Saugen.

Saugen further asserts that when "relying on circumstantial evidence to establish causation under Illinois law, 'the conclusion sought must be more than speculative; rather the conclusion must be the only probable conclusion.'" (R. 52, Saugen's Reply at 3-5 (citing *Baugh v. Cuprum S.A. de C. V.*, 845 F.3d 838 (7th Cir. 2017)).) But *Baugh* involved an appeal of the denial of a motion for judgment as a matter of law after a jury found in the plaintiff's favor. 845 F.3d at 842. And at this stage, James must simply point to evidence from which a jury could reasonably find that the Slayer Statute applies. *Baugh* is therefore inapposite.

Finally, Saugen contends that *Falcon v. City of Chicago*, No. 17 CV 5991, 2021 WL 1222869, at *4 (N.D. Ill. March 31, 2021), is directly on point because the court there viewed the circumstantial evidence as insufficient to create an issue of fact regarding the decedent's death by suicide. (R. 52, Saugen's Reply at 4-5.) But unlike James, the plaintiff in *Falcon* presented virtually no circumstantial evidence to support any inference that could be drawn in her favor. *Falcon*, 2021 WL 1222869, at *4. Indeed, the only evidence she presented to dispute the decedent's presumed suicide was testimony that the decedent was "generally a happy person" and unlikely to commit suicide. *Id.* at *3.

Here, James has offered just enough circumstantial evidence to get by summary judgment. First, the evidence shows that Saugen had a motive to poison Michael. That is, if Saugen gained access to the insurance proceeds, he could continue his drug use. Saugen was aware that in June 2022 Michael named him the primary beneficiary of the Policy. (R. 48, JSOF ¶ 10.) Saugen locked himself in

15

the bathroom and broke up with Michael on October 7, 2022, after Michael refused to give him money for drugs. (R. 42-1, SSOF, Ex. D, Saugen Dep. at 52-53.) Michael's therapist noted that during the time Saugen and Michael were dating, Michael discussed "[d]oing what [he] want[ed] without [his] partner," feeling "taken advantage of due to financial stability," and questioning how he should feel when someone thinks he has money. (See, e.g., R. 42-1, SSOF, Ex. K, Therapist Notes at 77, 79, 83.) Although the therapist's notes do not name Saugen specifically, (R. 53, SRJSOF ¶ 68), the notes are from the time when Michael and Saugen were dating. That coupled with Saugen's own testimony that he asked Michael for money to buy drugs and reacted with hostility when Michael refused, (id. ¶ 43; R. 42-1, SSOF, Ex. D, Saugen Dep. at 52-53), could lead a factfinder to infer that Saugen relied on Michael to support his drug habit.

Second, the record reflects an important inconsistency regarding Saugen's discovery of Michael's body and alleged "bottles of G" in the room, and this inconsistency could be used to infer the means Saugen used to kill Michael. (R. 42-1, SSOF, Ex. E, Meierdiercks Dep. at 49-51.) On the morning of October 27, 2022, while police were still in the apartment, Meierdiercks testified that Saugen had told him that Michael died of a GHB overdose and that there were "bottles of G" all around Michael's room. (Id.) However, the medical examiner's report reflects the responding CPD officer's statement that "no drugs or paraphernalia were found on scene." (R. 48, JSOF, Ex. M, Cook Cnty. Med. Rep. at 4.)

16

Saugen's comment regarding the presence of GHB bottles in Michael's room, despite the officer's report to the contrary, could support the reasonable inference that Saugen was aware that Michael overdosed before it had been determined by a medical examiner and was an effort to create a narrative that Michael died accidentally or by suicide.  Further, Saugen's refusal to provide the empty GHB bottles to the police could lead a factfinder to reasonably infer that Saugen was withholding evidence from the police.  There are alternative and innocent explanations for these statements and behavior, but the court must draw all inferences in James's favor at this stage, and it finds that this evidence could support a reasonable inference that Saugen was aware of the cause of Michael's death because he used GHB to poison Michael.

The postmortem GHB concentration in Michael's blood could also give rise to an inference that something was amiss.  For background, before James served his expert's report, the court entered an order "urg[ing James] . . . to assess whether Dr. Negrusz's report is useful" given that "the remaining issue is whether Saugen intentionally caused the death of Michael." (R. 36.)  The court explained that based on its "rudimentary understanding, a toxicology analysis can only provide information on the types of substances present in an individual and the level of those substances, not the identification of the individual responsible for the presence of those substances."  (Id.)  The court expressed concerns that Dr. Negrusz's report would not help a factfinder assess the connection between the undisputed fact that Michael died from a GHB overdose and James's accusation

17

that Saugen intentionally caused Michael's overdose. (Id.) As anticipated, Dr. Negrusz does not suggest how Michael consumed the level of GHB found in his system. (See generally R. 42-1, SSOF, Ex. A, Dr. Negrusz Ltr.)

Rather, Dr. Negrusz confirmed that the postmortem concentration of GHB, around 980 mcg/mL, was "within the range of lethal concentrations detected in poisonings with this compound."[3] (Id. at 2.) In fact, Dr. Negrusz estimated that this concentration suggested a dose that exceeded 20 grams, more than four times the amount of a 4.5-gram single dose that causes light to moderate sleep, (id.), and 10 times more than what Meierdiercks suggested was a 2-gram single dose that Michael and his friends typically took, (see R. 42-1, SSOF, Ex. E, Meierdiercks Dep. at 45). Dr. Negrusz also explained that GHB is "quickly eliminated" from a user's blood after it is consumed. (R. 42-1, SSOF, Ex. A, Dr. Negrusz Ltr. at 2.) Specifically, "the biological half-life [of GHB] is 0.3-1 hour, meaning that the concentration of GHB decreases from its maximum by 50% between 18-60 minutes." (Id.) Based on Dr. Negrusz's opinion, a factfinder could infer that the concentration of GHB in Michael's system, which was already extremely high, had been even higher before his death. But even without any of the GHB having been eliminated from Michael's system, the extremely high concentration suggests an unusually excessive dose. In short, the dose found in Michael's system was significantly higher than a typical recreational dose and drawing every inference at this stage in

---

[3] This court is not inclined to allow Dr. Negrusz to use the word "poisoning" at trial. He may be limited to discussing that the level of GHB found in Michael's system was "lethal."

18

James' favor, could support a reasonable inference that the amount of GHB consumed was intended to end Michael's life.

Third, the evidence shows that Saugen had the opportunity to poison Michael. Saugen was the only person other than Michael in the apartment when Michael was found dead, and he prepared dinner for Michael the previous night. "[T]he whole may be greater than the sum of its parts" in determining whether liability exists. *Kleen Prods.*, 910 F.3d at 934. Here, viewing the evidence in James's favor, the court finds that a factfinder could conclude that Saugen intentionally caused Michael's overdose. The fact that equally plausible inferences (e.g., Michael took his own life or accidentally overdosed) could be drawn from the same evidence does not permit the court to grant summary judgment here because it may not weigh the likelihood of competing inferences at this stage.

## Conclusion

For the foregoing reasons, Saugen's motion for summary judgment is denied.

**ENTER:**

_____
**Young B. Kim
United States Magistrate Judge**